


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | SUPERSEDING INFORMATION |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | CASE NO. 1:24 CR 258 |
| DARMANI HAWKINS, | ) | Title 18, United States Code, |
| | ) | Sections 1349 and 1708 |
| Defendant. | ) | |

GENERAL ALLEGATIONS

At all times material to this Superseding Information, unless otherwise indicated:

1. Defendant DARMANI HAWKINS resided in the Northern District of Ohio.

2. Bank 1 was a federally insured financial institution as defined under Title 18, United States Code, Section 20. Bank 1 was headquartered in Charlotte, North Carolina.

3. Bank 2 was a federally insured financial institution as defined under Title 18, United States Code, Section 20. Bank 2 was headquartered in Mattoon, Illinois.

4. Bank 3 was a federally insured financial institution as defined under Title 18, United States Code, Section 20. Bank 3 was headquartered in Pittsburgh, Pennsylvania.

5. Bank 4 was a federally insured financial institution as defined under Title 18, United States Code, Section 20. Bank 4 was headquartered in New York, New York.

*Unemployment Insurance Background*

6. The Social Security Act of 1935 initiated the federal and state unemployment insurance ("UI") system. The system provided benefits to individuals who are unemployed for reasons beyond their control. The purpose of the UI system was twofold: first, to lessen the

effects of unemployment through cash payments made directly to laid-off workers, and second, to ensure that life necessities were met on a weekly basis while the worker seeks employment.

7. State unemployment systems and benefits were joint state and federal enterprises administered by the State Workforce Agency ("SWA") of a given state and largely financed by taxes on private employers located in that state. In California, the SWA was the Employment Development Department (the "EDD"). Other states administered their UI programs through analogous state-run agencies. Regardless of state, the United States Department of Labor ("DOL") funded each of the respective state agencies' administrative costs surrounding UI, including salaries, office expenses, and computer equipment.

8. When state unemployment benefits were exhausted, they could be supplemented by federal funds appropriated by the DOL. The federal government provided significant supplemental benefits to the states as a result of the COVID-19 pandemic.

9. Normally (in the absence of fraud), an unemployed worker initiated an unemployment claim ("UI claim") with his or her state's SWA. This could be accomplished by submitting a claim in person, over the telephone, or via the Internet. Recently, most UI claims were filed online through a state's SWA website. In order to be eligible for UI benefits, the worker must have demonstrated a certain level of earnings in several quarters immediately preceding the application. The amount of unemployment benefits that a UI claimant might be eligible for depends on a variety of factors, including but not limited to the length of his or her previous employment and the amount of wages he or she earned.

10. The SWA either approved or rejected a UI claim based on the application made by the unemployed worker. If the SWA approved a UI claim, the claimant was required to re-

certify the claim via telephone or Internet at various times during the life of the claim and certify that he or she was still unemployed.

11. One way in which unemployment benefits were provided to a claimant was via a debit card issued by a financial institution, which was mailed to the claimant through the U.S. Mail. The unemployment benefits were loaded onto the debit card electronically, and additional benefits were loaded onto the card electronically at intervals thereafter.

12. EDD provided UI benefits to claimants through debit cards issued by Bank 1.

13. In an effort to prevent and otherwise inhibit fraud, the SWAs captured certain data surrounding the interaction between an individual and the UI system. Each time a claim was accessed in the system, it created a digital trail. Although each state used its own separate SWA system, many times the data that was collected included the dates, times, IP address, and Media Access Control ("MAC") address associated with a device accessing a claim. The SWA systems tied this information to the user-entered information captured to facilitate the claim (i.e. name, address, social security number, bank account numbers, bank routing numbers, etc.). It was through the analysis of this data that SWAs and investigating agents could identify fraudulent characteristics associated with certain claims.

*Overview of Federal Funding for Pandemic-Related UI Programs*

14. On March 18, 2020, the Families First Coronavirus Response Act ("FFCRA") was signed into law. The FFCRA provided additional flexibility for state UI agencies and additional administrative funding to respond to the COVID-19 pandemic. Then, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. It expanded states' abilitis to provide assistance to many workers impacted by COVID-19, including for workers who were not ordinarily eligible for UI benefits. The CARES Act provided

for three new temporary UI programs: Pandemic Unemployment Assistance; Pandemic Emergency Unemployment Compensation ("PEUC"); and Federal Pandemic Unemployment Compensation ("FPUC") (collectively, "Pandemic UI" or "PUI" benefits).

15. Pandemic Unemployment Assistance initially provided for up to 39 weeks of benefits to individuals who are: (1) self-employed, seeking part-time employment, or otherwise would not qualify for regular UI or extended benefits under state or federal law or PEUC under section 2107 of the CARES Act; and (2) unemployed, partially unemployed, unable to work, or unavailable to work due to specific COVID-19-related reason(s). Coverage included individuals who had exhausted all rights to regular unemployment compensation or extended benefits under state or federal law or PEUC. Under the Pandemic Unemployment Assistance provisions of the CARES Act, business owners, self-employed workers, independent contractors, or gig workers could qualify for Pandemic Unemployment Assistance benefits administered by the SWA if they previously performed such work in that state and were unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19-related reason. Pandemic Unemployment Assistance claimants were required to answer specific questions to establish their eligibility for Pandemic Unemployment Assistance benefits. Claimants had to provide their name, Social Security Number, and mailing address and self-certify that they met one of the COVID-19-related reasons for being unemployed, partially unemployed, or unable or unavailable to work. Initially, the eligible timeframe to receive Pandemic Unemployment Assistance was for weeks of unemployment beginning on or after January 27, 2020, through December 31, 2020. Pandemic Unemployment Assistance was later extended to March 14, 2021, by the Continued Assistance for Unemployed Workers Act of 2020, which was signed into law on December 27, 2020. Pandemic Unemployment Assistance was extended again to

September 6, 2021, by the American Rescue Plan Act of 2021, which was signed into law on March 11, 2021.

16. PEUC initially provided for up to 13 times the individual's average weekly benefit amount to individuals who have exhausted regular UI under state or federal law, have no rights to regular UI under any other state or federal law, were not receiving UI under the UI laws of Canada, and are able to work, available for work, and actively seeking work. However, states were required to offer flexibility in meeting the "actively seeking work" requirement if individuals were unable to search for work because of COVID-19, including because of illness, quarantine, or movement restriction. The eligible timeframe to receive PEUC was for weeks of unemployment beginning after the respective state has an established agreement with the federal government (but no earlier than April 5, 2020) through December 31, 2020. PEUC was later extended to March 14, 2021, by the Continued Assistance for Unemployed Workers Act of 2020, and extended again to September 6, 2021, by the American Rescue Plan Act of 2021.

17. FPUC provided individuals who were collecting regular UI, PEUC, PUA, and several other forms of unemployment compensation with an additional $600 per week. The eligible timeframe to receive FPUC was for weeks of unemployment beginning after the respective state had an established agreement with the federal government (but no earlier than April 15, 2020) through July 31, 2020. FPUC was later extended to March 14, 2021, by the Continued Assistance for Unemployed Workers Act of 2020, and extended again to September 6, 2021, by the American Rescue Plan Act of 2021.

18. According to data maintained by the United States Department of Labor—Employment and Training Administration, SWAs requested and received approximately $427 billion in CARES Act funding related to PUA, FPUC, and PEUC benefit payments. In

total, it is estimated that as of September 2021, the federal government's response to the COVID-19 pandemic will have included approximately $872.5 billion in pandemic-related UI funding for SWAs to administer for individuals who have been impacted by COVID-19.

19. Regardless of which of the three PUA programs described above (Pandemic Unemployment Assistance, PEUC, or FPUC) was involved, funds were distributed to program participants by the state's respective SWA, after the SWA received the funds from the U.S. Department of the Treasury. While there are different paths that payments can take from the Treasury Department to a given SWA, all such payments were routed through multiple states and across multiple state lines in interstate commerce.

COUNT 1
(Conspiracy to Commit Wire Fraud and Mail Fraud, 18 U.S.C. § 1349)

The United States Attorney charges:

20. The factual allegations contained in paragraphs 1 through 19 of this Superseding Information are re-alleged and incorporated as though fully set forth herein.

21. From in or around June 2020, through in or around November 2021, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DARMANI HAWKINS and others did knowingly and intentionally combine, conspire, confederate and agree with others to commit federal offenses, that is, to devise and intend to devise a scheme and artifice to defraud DOL, the EDD, and other SWAs, and to obtain money and property from the DOL, EDD, and other SWAs, by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing and attempting to execute the scheme and artifice to defraud:

a. caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

b. caused to be placed, in any depository for mail matter, any matter and thing to be sent and delivered by the Postal Service, and took and received from the Postal Service, any such matter and thing delivered by the Postal Service in violation of Title 18, United States Code, Section 1341 (Mail Fraud).

Objects of the Conspiracy to Defraud

22. The objects of the conspiracy were to: (1) induce the DOL, EDD, and other SWAs to issue Pandemic UI benefits to the conspirators to which they were not entitled; (2) use materially false statements and omissions to defraud the DOL, EDD, and other SWAs; (3) prevent detection of the conspiracy; and (4) enrich Defendants and others.

Manner and Means of the Conspiracy to Defraud

23. It was part of the conspiracy that:

a. Defendant and his coconspirators submitted and caused the submission of applications for Pandemic UI benefits to EDD and other SWAs.

b. Defendant and his coconspirators knowingly made and caused to be made materially false statements and omissions regarding businesses, employment history, residency, and other information on the Pandemic UI benefits applications to EDD and other state SWAs to appear eligible to receive Pandemic UI benefits.

c. As a result of the false and fraudulent Pandemic UI benefits applications submitted by Defendant and his coconspirators, Defendant and his coconspirators caused

EDD and other state SWAs to approve applications for fraudulent Pandemic UI benefits submitted by Defendant and his coconspirators.

d. As a result of the false and fraudulent Pandemic UI benefits applications submitted by Defendant and his coconspirators, Defendant and his coconspirators received Pandemic UI benefits from EDD and other state SWAs, including through direct deposit and via regular U.S. mail in the form of Bank 1-issued debit cards that Defendant and his coconspirators were not qualified and authorized to receive.

e. Upon receiving the fraudulently-obtained Bank 1-issued debit cards from EDD, Defendant and his coconspirators made cash withdrawals via Bank 1 ATMs at multiple locations in the Northern District of Ohio using the EDD debit cards, thereby obtaining Pandemic UI benefits they were not qualified or authorized to receive.

Acts in Furtherance of the Conspiracy to Defraud

24. In furtherance of the conspiracy and to achieve its objectives, one or more members of the conspiracy committed the following acts in furtherance, among others, in the Northern District of Ohio, Eastern Division, and elsewhere:

*L.M. Application*

25. On or about August 29, 2021, HAWKINS caused the submission of an electronic application for Pandemic UI benefits in the name of L.M. to EDD from an IP address associated with HAWKINS and listing HAWKINS's residential address in Aurora, Ohio. L.M. did not submit the application and did not reside either in California or at HAWKINS's address in Ohio.

26. On or about September 8, 2021, as a result of HAWKINS's submission, Bank 1 sent, via regular U.S. mail, to HAWKINS's address in Aurora, Ohio, a Bank 1-issued debit card in the name of L.M., which was subsequently loaded with Pandemic UI benefits in the approximate amount of $1,500.

27. On or about September 18, 2021, HAWKINS withdrew $1,000 from a Bank 1 ATM in Aurora, Ohio, using the Bank 1-issued debit card in the name of L.M.

*C.G. Application*

28. On or about July 12, 2021, HAWKINS caused the submission of an electronic application for Pandemic UI benefits in the name of C.G. to EDD from an IP address associated with HAWKINS in Aurora, Ohio, listing a phone number associated with HAWKINS and a residential address in Chowchilla, California. C.G. did not submit the application and did not reside in Chowchilla, California.

29. On or about August 2, 2021, as a result of HAWKINS's submission, Bank 1 sent, via regular U.S. mail, to an address in Chowchilla, California, a Bank 1-issued debit card in the name of C.G., which was subsequently loaded with Pandemic UI benefits in the approximate amount of $27,450.

30. On or about September 8, 2021, HAWKINS caused the submission of a change of address form in C.G.'s name to the United States Post Office. The change of address form listed the Chowchilla, California address on C.G.'s Pandemic UI application as the old address, and listed HAWKINS's address in Aurora, Ohio, as the new address.

31. The Bank 1-issued Pandemic UI debit card originally issued in C.G.'s name on August 2, 2021 was reported as lost to Bank 1, and on or about September 15, 2021, Bank 1 sent a replacement card to the Chowchilla, California, address via regular U.S. mail. However, because of the change of address HAWKINS caused to be filed with the United States Post Office on September 8, the Post Office forwarded the card to HAWKINS's address in Aurora, Ohio.

32. From on or about September 30, 2021, through on or about November 22, 2021, HAWKINS made approximately $7,000.00 in withdrawals from Bank 1 ATMs in the Northern District of Ohio using the replacement Bank 1-issued debit card in the name of C.G.

33. On or about November 24, 2021, HAWKINS used the replacement Bank 1-issued debit card in the name of C.G. to make an approximate $9,013.90 payment on a car loan for a vehicle titled in HAWKINS's name.

34. On or about November 25, 2021, HAWKINS used the replacement Bank 1-issued debit card in the name of C.G. to make an approximate $6,006.95 payment on a car loan for a vehicle titled in HAWKINS's name.

All in violation of Title 18, United States Code, Section 1349.

COUNT 2
(Conspiracy to Commit Bank Fraud, 18 U.S.C. § 1349)

The United States Attorney further charges:

35. The factual allegations contained in paragraphs 1 through 5 of this Superseding Information are re-alleged and incorporated as though fully set forth herein.

36. From on or about April 11, 2023, through on or about November 10, 2023, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DARMANI HAWKINS did knowingly and intentionally combine, conspire, confederate and agree with others to commit federal offenses, that is, to devise and intend to devise a scheme and artifice to defraud federally insured financial institutions, and to obtain money and property from federally insured financial institutions, by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, did knowingly obtain and attempt to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means

of false or fraudulent pretenses, representations, or promises, in violation of Title 18, United States Code, Section 1344.

Objects of the Conspiracy and Scheme to Defraud

37. The objects of the conspiracy and scheme to defraud were to: (1) unlawfully obtain funds from victims' financial institution accounts; (2) prevent detection of the conspiracy and scheme to defraud; and (3) enrich Defendant and others.

Manner and Means of the Conspiracy and Scheme to Defraud

38. It was part of the conspiracy and scheme to defraud that:

a. Defendant messaged other social media users to coordinate the theft of checks from the U.S. Mail and the deposit of stolen checks into coconspirators' and confederates' bank accounts.

b. Defendant posted to social media recruiting United States Postal Service ("USPS") employees to assist in the scheme, including by stealing mail.

c. Defendant posted to social media recruiting individuals with bank accounts at established financial institutions to deposit stolen checks into their accounts, and return the funds to Defendant, in exchange for payment, including in the form of retaining a share of the deposited funds.

d. Defendant obtained checks stolen from the custody of USPS, or the account information from such checks, and unlawfully altered those checks, or counterfeited checks with the account information, making the checks payable to a coconspirator or confederate.

e. A member of the conspiracy, or confederate acting in concert with Defendant, endorsed and deposited the fraudulent checks obtaining funds from victims' bank accounts.

f. A member of the conspiracy, or confederate acting in concert with Defendant, converted the stolen funds to the use and benefit of the members of the conspiracy, including by ATM withdrawals and either retaining the cash or transferring it to another member of the conspiracy.

Acts in Furtherance of the Conspiracy and Scheme to Defraud

39. In furtherance of the conspiracy and scheme to defraud, and to effect the goals and conceal the existence thereof, Defendant and others performed the following acts in the Northern District of Ohio, Eastern Division, and elsewhere:

*Arranging to Steal Checks from the U.S. Mail*

40. On or about April 11, 2023, Defendant messaged Person 1, via the direct message function on a social media app, asking, "You got some old slips? Tryna pay this [Phone Company] bill my boy [Do you have any stolen checks? I need to pay my phone bill.]"

41. On or about June 28, 2023, Defendant messaged Person 2 via the direct message function on a social media app, asking, "U got mail carrier down these ways [Do you know a USPS mail carrier who is willing to steal mail?]" Person 2 replied, "Yeah he in California."

42. On or about July 8, 2023, Defendant messaged Person 2, "I tried to lock in wit you carrier[.] [The carrier] never got back in [I tried to contact the USPS employee you told me about but haven't heard back,]" and "I got a plug with the slips now tho [I found someone who has stolen checks that we can use.]"

43. On or about July 8, 2023, Defendant messaged Person 2, "My plug be charging like 450 – 600 for like a 20K [The person who is providing me stolen checks is charging me between $450 and $600 for checks with a face value of $20,000.]"

44. On or about July 7, 2023, Defendant messaged Person 1, "And u got a mail carrier bra bra? [Do you know a USPS mail carrier who is willing to steal mail?]"

45. On or about July 10, 2023, Defendant messaged Person 1, "You got any high numbs? [Do you have any stolen checks for high dollar amounts?]" Person 1 replied, "Yea I'm Trynna drop [Yes, and I'm trying to find a place to deposit them]." Defendant replied, "Let me buy [I will buy them from you.]" Person 1 responded, "I don't be sellin food jus tryna drop [I'm not interested in selling the stolen checks, just looking for accounts where I can deposit them.]"

46. On or about July 21, 2023, Defendant messaged Person 2, "I got a 10.8K slip right now [I have a stolen check for $10,800 right now.]"

47. On or about July 21, 2023, Defendant messaged Person 2, "You hit a [specified bank] b4? If so do you kno what time them b**ches pop on [Have you deposited a stolen check at specified bank before? If so, do you know what time the money will post to the account?]" Defendant followed up approximately a half hour later, stating, "That b**ch posted [The stolen check cleared and funds were available.]"

*Recruiting USPS Employees*

48. On or about August 3, 2023, Defendant posted on his social media account with an image of a carpet overlaid with the following text: "If you work @ #usps or kno someone dm me now 10K weekly [I can pay a USPS employee $10,000 per week to help me.]"

49. On or about October 2, 2023, Defendant made a similar post on his social media account, offering to pay $10,000 "up front" for the assistance of a USPS employee.

*Recruiting Bank Account Owners*

50. On or about August 2, 2023, Defendant posted to his social media account an image of banded stacks of $20 bills on a blanket, and a spread of numerous $100 bills. Overlaying the images, Defendant included in colorfully-highlighted text a list of names of prominent financial institutions, and the following concluding message: "All other Major banks

🏦 & Credit Unions report to me now 20k or better [If you have an account at an established financial institution, I will pay you $20,000 or more to use your account.]"

51. On or about October 2, 2023, Defendant posted to his social media account with an image of an outdoor pool scene overlaid with text listing the names of prominent financial institutions and the following text: "ALL MAJOR CREDIT UNIONS REPORT TO ME NOW FOR GUARANTEED FUNDS 🤞 [If you have an account at a prominent financial institution, I will pay you to use your account.]"

*Depositing Stolen Checks*

*Check #7004*

52. In or around June 2023, a member of the conspiracy stole from the U.S. Mail stream a piece of mail containing check #7004 for approximately $171,935.49 drawn on Entity 1's business checking account with Bank 1, which had been deposited in the regular U.S. Mail in Birmingham, Alabama, for delivery to its intended recipient in Atlanta, Georgia.

53. On or about June 20, 2023, a member of the conspiracy deposited check #7004, for approximately $171,935.49, altered to change the payee to F.W., into F.W.'s Bank 4 account ending in *3996 at a Bank 4 ATM located in Carrollton, Texas.

54. From on or about June 29, 2023, through on or about July 10, 2023, in the Northern District of Texas, a member of the conspiracy caused $167,179.78 to be withdrawn from F.W.'s Bank 4 account across a number of withdrawals.

55. On or about August 2, 2023, Defendant made a social media post with a screenshot of a Bank 4 banking application, showing an available balance of approximately $171,935.49 in F.W.'s Bank 4 account ending in *3996 and a caption reading "AGED AND FRESH BLUES 💙 & ANY OTHER MAJOR BANKS RUSH TO ME NA [If you have an

established or new account at Bank 4, or at any other prominent financial institution, contact me for an opportunity to make money.]"

*Check #1010564*

56. On or about June 29, 2023, a member of the conspiracy stole from the U.S. Mail stream a piece of mail containing check #1010564 for approximately $99,798.57 drawn on Entity 2's business checking account with Bank 2, which had been deposited in the regular U.S. Mail in Springfield, Illinois, for delivery to its intended recipient in St. Louis, Missouri.

57. On or about July 7, 2023, a member of the conspiracy deposited check #1010564, for approximately $99,798.57, altered to change the payee to A.D., into A.D.'s Bank 4 account ending in *8208 at a Bank 4 ATM located in Charlottesville, Virginia.

58. From on or about July 18, 2023, through on or about July 31, 2023, a member of the conspiracy caused to be withdrawn a total of approximately $88,672.36 from A.D.'s Bank 4 account across a number of withdrawals.

59. On or about August 2, 2023, Defendant made a social media post with a screenshot showing a balance of approximately $99,798.57 in A.D.'s Bank 4 account ending in *8208 and a caption reading "ALL [Bank 4] FRESH & AGED COME HERE 🤑 💚💚💚 any other banks rush ta me [All people with an established or new account at Bank 4, or at any other prominent financial institution, can contact me quickly for an opportunity to make money.]"

*Check #15074*

60. On or about October 4, 2023, a member of the conspiracy stole from the U.S. Mail stream a piece of mail containing check #15074 for approximately $437,675.28 drawn on

Entity 3's business checking account with Bank 3, which had been deposited in the regular U.S. Mail in Akron, Ohio, for delivery to its intended recipient in Ravenna, Ohio.

61. On or about October 9, 2023, Defendant deposited check #15074, for approximately $437,675.28, altered to change the payee to J.B.D., into J.B.D.'s Bank 4 account ending in *2794 at a Bank 4 ATM located in Solon, Ohio.

All in violation of Title 18, United States Code, Section 1349.

COUNT 3
(Mail Theft, 18 U.S.C. §§ 1708 and 2)

The United States Attorney further charges:

62. The factual allegations of Count 2s of this Superseding Information are re-alleged and incorporated by reference as if fully set forth herein.

63. On or about October 9, 2023, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DARMANI HAWKINS unlawfully possessed any article or thing that had been contained in a mail parcel, which has been stolen, taken, embezzled, and abstracted, to wit: the stolen check #15074, knowing the same to have been stolen, taken, embezzled, and abstracted, in violation of Title 18, United States Code, Sections 1708 and 2.

REBECCA C. LUTZKO
United States Attorney

By: Michael L. Collyer
Michael L. Collyer, Chief
Criminal Division